William F. Ewe, Appellant, v. Maurice P. Angland, Appellee.

## Gen. No. 43,034.

Heard in the second division of this court for the first district at the April term, 1944.

Opinion filed April 19, 1945. Rehearing denied May 1, 1945. Released for publication May 2, 1945.

GARIEPY & GARIEPY, of Chicago, for appellant; FRED A. GARIEPY, OWEN RALL and JOHN SPALDING all of Chicago, of counsel.

BRUCE S. PARKHILL, of Chicago, for appellee.

MR. JUSTICE SCANLAN delivered the opinion of the court.

A complaint filed by William F. Ewe alleges that he was the holder of five promissory notes, payable to his order, the total sum of the notes being $2,700; that they were executed by Maurice P. Angland and were overdue and unpaid. The amended verified answer of Angland interposes the defense of lack of consideration and the further defense that he was coerced into signing the notes in consequence of the institution by plaintiff of criminal proceedings against him, in which he was charged with embezzling certain securities of plaintiff; that after his arrest in said proceedings he executed and delivered the notes ''against his will and solely by reason of such duress, coercion and threats,'' and he ''was induced to make and sign said notes by the plaintiff through threats of criminal prosecution and imprisonment.'' Angland filed a counterclaim, in which he alleges that said criminal proceedings were instituted by Ewe maliciously and without probable cause, Ewe knowing that defendant had not converted any securities belonging to plaintiff, and damages are alleged in the amount of $50,000. Angland also filed a second counterclaim alleging that Ewe was guilty of a malicious abuse of process in said criminal proceedings, and prays for damages in the sum of $5,000.

After a trial by the court without a jury, the following judgment order was entered:

''THIS MATTER COMING ON TO BE HEARD upon the respective motions of the parties for judgment, the

Court having fully considered the evidence introduced at the trial and the arguments and briefs of the respective attorneys and being fully advised in the premises,

[A] "It Is Hereby Ordered, Adjudged and Decreed that judgment be and hereby is entered for the defendant, Maurice P. Angland, upon the complaint and amendments thereto and additional counts of the plaintiff, William F. Ewe, for recovery on several notes sued on.

[B] "It Is Further Ordered, Adjudged and Decreed that judgment be and is hereby entered for the counterdefendant, William F. Ewe, and against the counterclaimant, Maurice P. Angland, upon the counterclaim for malicious abuse of process.

[C] "It Is Further Ordered, Adjudged and Decreed that judgment be and is hereby entered for the counterclaimant, Maurice P. Angland, against the counterdefendant, William F. Ewe, upon the counterclaim for malicious prosecution for the sum of Five Thousand Dollars ($5,000.00) and costs of suit; to all of which plaintiff, William F. Ewe, hereby duly objects and excepts, except as to the finding and judgment on malicious abuse of process herein made."

William F. Ewe, plaintiff and counterdefendant, appeals from that part of the judgment order designated [A] and also from that part designated [C]. Maurice P. Angland, defendant and counterclaimant, appeals from that part of the judgment order designated [B] and also appeals from the amount of damages awarded him in that part of the judgment order designated [C] upon the ground that the amount awarded him was grossly inadequate, and he asks that this court, without remanding the cause, increase the amount of the damages.

Appellant, Ewe, contends that there was a valid consideration for the notes and that the trial court erred in finding for defendant upon plaintiff's complaint. After a careful review of the evidence we are

satisfied that there are certain salient facts that show clearly that there was no consideration for the notes and that Angland executed and delivered them to Ewe under duress. Angland was president and treasurer of Angland & Company, Inc., a corporation engaged in the securities business in Minneapolis, and he owned 490 shares out of 1,000 shares issued. Ewe, a customer of the corporation, had about thirty transactions with it during 1936 and 1937. While all of his transactions were handled by Angland, it is clear that his dealings were with the corporation. Ewe testified that all of his business dealings were with Angland & Company and that when that company purchased securities for him he paid for them by his personal check to that company; that any checks he received on account of the transactions were checks of the company. He wrote letters to the company in reference to the securities and received from it receipts and confirmations of orders. He had no trouble with Angland & Company until the last transaction. He testifies that on March 15, 1937, he turned over to Angland & Company two bonds, each for $1,000, and one $2,000 bond, with instructions to sell them, and that they were sold; that he received a receipt from Angland & Company for the securities; that he instructed the company to purchase a $1,000 Continental Roll and Steel Foundry bond out of the proceeds, which was purchased by the company and turned over to him in August 1937; that there was then due him from Angland & Company $3,597.85; that when he deposited the two bonds he gave instructions to remit to him the balance after sale; that he called up Angland about ten times for the purpose of getting a check for the balance due him; that Angland was never in when he called and never called Ewe back. Angland introduced testimony to the effect that there was a standing agreement with Ewe that balances in his favor were to be kept on

deposit with the company to be used for future purchases by Ewe; that about the middle of September, 1937, Ewe was in the office of Angland & Company and in a talk he had with Paul Semple, an employee of the company, Semple told Ewe to wait and they would give him a check for the balance due him and that Ewe replied, ''No, never mind. I will be buying something else here. Just let it stay.'' The Dodd-Jones industrial averages for stocks reached a peak of about 190 near the end of August, 1937, and then in the course of two months the averages fell to 113. On October 25, 1937, Angland & Company went into receivership and a receiver was appointed on that day. Between July 28, 1937, and the date of the receivership it paid out to customers a total of approximately $850,000. Ewe testified that maybe a month before he swore to the complaint against Angland he consulted with his attorney, Maag, about filing a claim in the receivership proceedings, and that later, *after the criminal case had been dismissed,* he filed a *verified* proof of claim against Angland & Company in the receivership matter, in which he stated:

''I.

''That on or about the 28th day of July, 1937, your Petitioner delivered to the defendant [Angland & Company, Inc.] the following bonds: $2,000, State of South Dakota Soldier's Bonus, sixes, 9/1/41, and $2,000 Canadian National Railway, fives, due 69, for the purpose of having said bonds sold and the proceeds thereof turned over to your Petitioner, and that said bonds were sold for a total amount of $4,617.68.

''II.

''That no part thereof has been paid by the Defendant to your Petitioner, except the sum of $1,019.83, leaving a balance due of $3,597.85.

''WHEREFORE, Your Petitioner, W. F. EWE, prays that his claim in the sum of $3,597.85, with interest

thereon from and after the 28th day of July, 1937, be allowed herein as a claim against the above-named receivership estate."

On January 3, 1938, Ewe swore to a complaint in the Municipal Court of the City of Minneapolis, in which he charged "that on or about the 28th day of July, A. D. 1937, within the corporate limits of the City of Minneapolis, Hennepin County, Minnesota, Maurice P. Angland, then and there being and then and there having in his possession, custody and control as agent, servant and bailee of one William F. Ewe, two (2) one thousand dollar Canadian National Railway bonds 5 per cent payable 10–1–1969, bearing certificate numbers M 19994 and M 19987, respectively, and of the total value of Two Thousand Three Hundred Eighty-eight and 1/100 Dollars, a more particular description of said property being to the complainant unknown, the property of, and belonging to, the said William F. Ewe, as aforesaid; that the said Canadian National Railway bonds were then and there delivered to the said Maurice P. Angland by the said William F. Ewe, for the following purposes, to-wit: That he, the said Maurice P. Angland, should forthwith sell the said bonds for the sum of Two Thousand Three Hundred Eighty-eight and 1/100 Dollars in cash money, and that he, the said Maurice P. Angland, shall forthwith and immediately then and there turn over said Two Thousand Three Hundred Eighty-eight and 1/100 Dollars to the said William F. Ewe, and that in case said Maurice P. Angland should fail to sell said bonds as herein stated, then he, the said Maurice P. Angland, should then and there and without delay return said bonds to the said William F. Ewe, and for no other purpose; that the said Maurice P. Angland completely failed to carry out the purposes for which said bonds were so entrusted to the said Maurice P. Angland, as herein stated, but did then and there, wilfully, unlawfully, wrongfully, knowingly and feloniously ap-

propriate said property to his own use and embezzle the same, without the consent of the said William F. Ewe, as aforesaid, the true owner of said property, of his said property, and to appropriate the same to the use of him, the said Maurice P. Angland, contrary to the Statute in such case made and provided and against the peace and dignity of the State of Minnesota. Wherefore, complainant prays that said offender may be arrested and dealt with according to law.

"(Signed) William F. Ewe.

"Sworn to and subscribed and complained of before me this 3rd day of January A. D. 1938.

"Paul M. Guilford,

"Judge of Municipal Court."

While Mr. Ewe was on the stand the following occurred: "Q. And as I understand it, Mr. Ewe, you figured you had lost this sum of money by reason of the receivership and the prosecution of Mr. Angland was motivated by your desire to get that money back; was it not? A. Well, I don't know just how to answer that question. I am not antagonistic. It was not motivated by a spirit of antagonism at all. Q. Rather it was your desire to get your money which you had lost? A. Yes, sir." On January 5, 1938, Angland was arrested in the Board of Trade building, Chicago, on the warrant issued on said complaint and he was held in jail in Chicago for over two days, during which time he was subjected to a number of indignities. He was taken to Minneapolis by police officers of that city and on arrival there he was placed in the city jail, where he was confined Friday night, Saturday, Sunday and a part of Monday, when he was admitted to bail. During his incarceration in that jail he was again subjected to indignities. He appeared in the Municipal Court three or four times and on January 19, 1938, upon motion of an Assistant County Attorney, the cause was dismissed. It is clear from the evidence that

after Angland had been taken to Minneapolis certain lawyers, who were friends of Angland and Maag, Ewe's attorney, took up with Maag the matter of a settlement of all difficulties between Ewe and Angland, and finally one of the lawyers, Sherman, made an agreement with Maag that Angland should execute the notes in question, and the aggregate amount of the notes, $2,700, was reached by deducting from $3,597.85 the amount they figured that Ewe would probably receive out of the receivership matter on a claim he was to file in that proceeding. Maag testified that he stated to Sherman that his client, Ewe, had told him he would take the notes in settlement of the controversy between them. Sherman then had Angland execute the notes and Sherman delivered them to Maag. Maag further testified that when Sherman delivered the notes to him Sherman said, " 'Now, Mr. Maag, you and I understand each other. I want you now, of course, to dismiss this criminal proceeding against Mr. Angland, and that is the purpose of these notes.' I said I understood that. I think he also did say, 'In addition to that I want you to go over to the county attorney's office and see that this thing is dismissed' ' '; that Sherman then laid the notes on Maag's desk, at which time Sherman stated, " 'Now', he said, 'I want you to go down and get these criminal proceedings dismissed and that is what these notes are for' or 'here are these notes and that is what I got these notes for,' and closed his statement by saying, 'You and I have understood each other all the time;' " that when he, Maag, went to see the County Attorney, Goff (who was deceased at the time of the instant trial), he explained to Goff about the settlement and asked for a dismissal of the criminal case, and Goff insisted upon having a written statement from Maag in reference to the proposed dismissal; that he wrote to Goff, on January 18, 1938, that a conviction of Angland could not be obtained. Upon the instant hearing Maag testified that

this last statement that he made to the County Attorney was not in fact his opinion; that he wrote the letter to Goff to bring about a dismissal of the criminal case. Angland testified that when he executed the notes he did not intend that they should bring about the dismissal of the criminal case against him and that he executed the notes merely to obtain a prompt trial of the charge against him. This testimony of Angland, in the light of all the evidence bearing upon the question, and *his verified answer* to Ewe's complaint, cannot be taken seriously, and it is apparent that he testified as he did because if he admitted the real purpose in executing the notes it would have destroyed his claim for malicious prosecution. That Angland at the time he executed the notes was extremely nervous and overwrought as a result of his arrest and the indignities from which he suffered is undisputed. It must be noted that Ewe never surrendered his claim against Angland & Company in the receivership matter and that he received certain dividend payments from the receiver on account of his claim. In our recital of the facts we have avoided as much as possible evidence offered on behalf of Angland. We may say, however, that Angland offered evidence to the effect that Ewe stated after the arrest that he did not know whether or not Angland was guilty of any crime and that all that he was interested in was getting his money. Ewe had no legal control of the criminal proceeding and had no interest in it, save as a witness, and the dismissal of that cause, even if it be assumed that Maag induced the County Attorney to dismiss it, could not be urged as a legal consideration for the notes. Indeed, counsel for Ewe make no such contention, but they contend, in a rather feeble way, that it might be reasonably argued that Angland was civilly responsible to Ewe for the loss and therefore the latter would have ''a disputed claim'' against Angland which would be a sufficient consider-

ation for the giving of the notes. They cite law to the effect that a compromise of a claim which is asserted in good faith and the validity of which the parties at the time entertained a doubt is a valuable consideration and will support a promise or contract. It is a sufficient answer to this contention to say that the trial judge would have been justified in finding that Ewe never considered that he had a valid claim against Angland and that he used the criminal proceedings solely as a club to force Angland to pay him a claim he had against Angland & Company. The finding of the trial court for Angland as to the claim upon the notes was the only finding that could be justified under the facts and the law.

Ewe next contends that the judgment against him on the counterclaim for malicious prosecution is contrary to the evidence and the law. The first point made is that the criminal prosecution was instituted on the advice of counsel after a full and fair disclosure of all the material facts, and the testimony of Dretchko, the Assistant County Attorney, is cited in support of this point. The trial judge found that Ewe knowingly and wilfully withheld certain material facts from that attorney; that Ewe represented to him that his transactions were wholly with defendant, and that Ewe failed to disclose to the attorney that during the years 1936 and 1937 he had been doing business solely with the corporation of which defendant was president. The Assistant County Attorney testified that when Ewe and his attorney, Maag, first presented the matter to him, something else was occupying his mind, and that he could not recall exactly all that they said to him; that he remembered that Ewe stated that he had on occasions purchased securities, bonds and stocks, from Angland and had also given him various types of securities to sell, that as to the particular transaction in question he had given the bonds to Angland to dispose of and that Angland had given him a receipt for

the bonds, and that Angland had sold the bonds; that he then said to them: " 'Well, I am busy at the moment and would much prefer you give me a complete written statement of your transaction and dealings with Angland', and I told him at that time there was no question in my mind, so far as the story had been given to me, that there was sufficient grounds for us to issue a complaint, but I said we would like very much to have you put this all in writing. That was the substance of the conversation I had with him and his attorney at that time and they left with the under-standing that within a few days I would receive a written statement from them." The written statement made by Ewe, and which was furnished to the Assistant County Attorney by Ewe and Maag, states in plain language that the transaction in question was entirely with Angland. However, the Assistant County Attorney finally testified that while "practically all of the facts are embodied in the written statement," that there was some other information furnished him, that he was shown by Mr. Maag certain papers which showed that Angland & Company was a corporation and that Angland was president of it, and that the question was asked him by Maag or Ewe whether or not the fact that Angland & Company was a corporation would make any difference so far as Angland himself was concerned, and that he answered, "No, we will start our action against Angland as an individual." The witness further testified that a couple of days before the criminal cause was dismissed Maag came to him and told him that Ewe was desirous of dismissing the action and that he told Maag that he would have to take the matter up with the County Attorney, Mr. Goff; that he asked Maag what motivated Ewe in wanting to dismiss the proceeding and that Maag said that an amicable adjustment had been made. Counsel for Angland calls attention to the fact that the Assistant County Attorney was a friend of Ewe

and he argues that that part of his testimony wherein he stated that at the time he recommended the filing of the complaint he had, in addition to the written statement, information that Angland & Company was a corporation, was a friendly attempt to help Ewe and Maag. The trial court was of the opinion that all of the material information furnished the Assistant County Attorney by Ewe and Maag was contained in the written statement made by the latter. What disclosures were made to the Assistant County Attorney by Ewe and Maag involved a question of fact for the trial court to determine, and we are not disposed to disturb his finding in that regard. We find it difficult to believe that if Ewe and Maag had fully disclosed to the Assistant County Attorney the material facts surrounding the transaction in question that he would have advised Ewe to make the complaint against Angland. It is significant that the complaint drafted by the County Attorney followed strictly the facts stated in the written statement made by Ewe and that Maag afterward made a written statement to the said attorney that Angland could not be convicted of the charge. However, it is not necessary for us to pass upon the instant point in order to determine the instant contention.

The next point urged by Ewe is that the termination of the criminal case was brought about by compromise and agreement of the parties and therefore the action for malicious prosecution cannot be maintained. As we have heretofore stated, Angland seeks to evade the effect of the foregoing point by contending that he was never a party to any agreement that brought about the termination of the criminal proceedings and that he executed the notes merely to obtain a prompt trial of the case. He repudiates the actions of Sherman and the other attorneys who brought about the agreement with Maag that resulted in the termination of the case and asserts that they had no

authority to act for him. Under the plain facts of the case Angland's present position and the argument in support of it hardly merit serious consideration. The Minnesota law that applies to the instant point is that where the termination of the prosecution has been brought about by the procurement of the defendant or by compromise of the parties an action for malicious prosecution cannot be maintained. (See *Wickstrom v. Swanson,* 120 N. W. 1090, 1092.) Other Minnesota cases to the same effect might be cited. The same rule prevails in Illinois. (See *Barth v. Keller,* 315 Ill. App. 200, 206, decided by this Division of the court; also, *Rosenberg v. Hart,* 33 Ill. App. 262; *Ruble v. Cohn,* 212 Ill. App. 563, 564.) While it is true that the notes given by Angland were without legal consideration and were executed under duress because of the criminal proceedings pending against him, nevertheless, the dismissal of the criminal case resulted from the free agreement of the parties. Indeed, the purpose of the attorneys, who were friends of Angland, was to bring about the dismissal of the criminal proceeding, and they initiated the conferences that finally brought about the agreement to dismiss. The Assistant County Attorney caused the dismissal order to be entered because he understood that there had been an agreement of the parties. We are constrained to hold that the trial court erred in entering the judgment against Ewe upon the counterclaim for malicious prosecution.

Angland contends that the trial court erred in entering judgment for counterdefendant Ewe upon the counterclaim for malicious abuse of process. It is a sufficient answer to this contention to say that our ruling upon the last point urged by Ewe also disposes of the instant contention. This ruling also disposes of Angland's contention that the amount awarded him for damages upon his claim for malicious prosecution is grossly inadequate and that we should increase the said amount.

The judgment order of the Superior court of Cook county in favor of defendant, Angland, upon the complaint of plaintiff, Ewe, amendments thereto, and additional counts, for recovery upon the notes sued upon, is affirmed.

The judgment order of the Superior court of Cook county in favor of counterdefendant, Ewe, upon the counterclaim for malicious abuse of process, is affirmed.

The judgment order of the Superior court of Cook county in favor of counterclaimant, Angland, and against counterdefendant, Ewe, upon the counterclaim for malicious prosecution, is reversed.

*Judgment order in favor of defendant, Angland, upon complaint of plaintiff, Ewe, for recovery on notes sued upon, affirmed.*

*Judgment order in favor of counterdefendant, Ewe, upon counterclaim for malicious abuse of process, affirmed.*

*Judgment order in favor of counterclaimant, Angland, and against counterdefendant, Ewe, upon counterclaim for malicious prosecution, reversed.*

SULLIVAN, P. J., and FRIEND, J., concur.